**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JULIO GRACIANO,

                Petitioner,

                v.

BRUCE DAVIS, et al.,

                Respondents.

Civil Action No.: 18-16178 (ES)

OPINION

SALAS, DISTRICT JUDGE

Before the Court is Petitioner Julio Graciano's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (D.E. No. 13 ("Amended Petition" or "Am. Pet.")).  Having considered the parties' submissions, the Court decides this matter without oral argument.  *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the reasons expressed below, the Court **DENIES** the Petition and **DENIES** a certificate of appealability.

## I.    BACKGROUND

### A.    Factual Background

The New Jersey Superior Court, Appellate Division (the "Appellate Division") provided the following summary of facts and evidence presented at Petitioner's trial[1]:

> Elizabeth Lantigua, defendant's girlfriend, lived at one of four apartment buildings comprising Riverview Towers in Paterson. Between 10:00 and 11:00 p.m. on July 27, 2007, she was waiting in the lobby of her building for a pizza delivery.  A dark[-]skinned man complimented Lantigua on her cell phone and pretended to try and take it from her.  Lantigua called defendant and told him that there

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

was "some loco guy" who wanted to take her phone, but who "was just playing around with me." Lantigua's and defendant's phone records revealed several more calls were made between them.

Wilmer Marte, defendant's friend, was with defendant and several others that evening drinking in front of School 24 when defendant received a call from Lantigua. Defendant became angry during the call and afterwards said that someone had tried to "disrespect" Lantigua. Defendant walked away in a hurry, and Marte, Carlos Rojas, Angie Rodriguez, Manny Jacquez and Yokasta Gomez got into Jacquez's white van to look for him.

Once found, they convinced defendant to get into the van by telling him that they would take him wherever he wanted to go. Defendant said he wanted to go to his home, and along the way, he received additional phone calls. He told Marte that a "guy touched his girl's butt."

After arriving at his house, defendant went inside while the others waited outside. After two or three minutes, defendant returned to the van and asked to be driven to his "girl['s] house." When the van arrived at Riverview Towers, defendant remarked, "I think that's them." He told Jacquez to pass in front of the building, make a U-turn, and drop him off. At the time there were a lot of people outside the apartment complex.

Marte and Jacquez both testified that defendant fired several shots toward the apartment complex from the window of the van as it passed. Marte saw a small automatic handgun in defendant's hand. Gomez essentially corroborated these events.

Rodriguez, who claimed to be drunk, initially did not identify defendant as the shooter. However, several weeks later in a formal statement, she told police that defendant fired the shots. Defendant subsequently told Marte and Jacquez that he fired the shots to scare people, and he would take full responsibility.

Jermar Roberts, [one of the victim's] fiancé, saw a white van drive by, heard shooting and saw an arm extending from the passenger side of the van pointing in his direction. He fell to the ground as shots rang out. After the shooting stopped, Roberts saw [his fiancée] lying on the ground with blood coming from her right temple. She died from the wound.

Evette Frasier, John Boyd and John Stevenson were all standing near Roberts. Each testified in a similar fashion.

Officers Riccardo Scharon and John Kelly of the Paterson Police Department were in the immediate vicinity and heard what sounded like gunshots.  When they arrived in front of Presidential Boulevard, they saw a female lying on the sidewalk with an African-American male, later identified as Roberts, holding her head.  She was unconscious, unresponsive and bleeding from the head.  Roberts told them that two Hispanic males in a small, white minivan drove by firing shots.

All the shells and bullets recovered from the scene and from [the victim] were determined to have been fired from the same gun.  However, no gun was recovered.

Defendant elected not to testify and no defense witnesses were called.

*State v. Graciano*, No. A-6263-10T4, 2013 WL 4081017, at *2–3 (N.J. Super. Ct. App. Div. Aug. 14, 2013).

B.    **Procedural History**

At the conclusion of the trial, the jury convicted Petitioner of first-degree murder and related charges.  (D.E. No. 28-6 at 47–50 ("Judgment of Conviction")).[2]  The judge imposed an aggregate sentence of sixty-five years imprisonment with an eighty-five percent period of parole ineligibility.  (*Id.*).

With the assistance of counsel, Petitioner appealed his conviction and sentence.  (D.E. No. 28-6 ("Direct Appeal Brief or "Direct Appeal Br."); D.E. No. 28-7 ("*Pro Se* Supplemental Direct Appeal Brief" or "*Pro Se* Suppl. Direct Appeal Br.")).  On August 14, 2013, the Appellate Division affirmed the conviction and sentence.  *Graciano*, 2013 WL 4081017, at *2.  Petitioner filed a petition for certification (D.E. No. 29-2 ("Direct Appeal Petition for Certification")), which the New Jersey Supreme Court denied without comment on March 14, 2014.  *State v. Graciano*, 88 A.3d 189 (N.J. 2014).

---

[2]    Pin cites to D.E. Nos. 13 & 28-6 refer to the pagination automatically generated by the Court's electronic filing system.

Thereafter, Petitioner filed a petition for post-conviction relief ("PCR").  The PCR trial court conducted an evidentiary hearing on January 6, 2016 (D.E. No. 28-4, PCR Hearing Transcript ("PCR Hr'g Tr.")), and denied the petition in an oral decision on February 5, 2016 (D.E. No. 28-5, PCR Court Decision).  Petitioner appealed the PCR Court's decision (D.E. No. 30-2, PCR Appeal Brief ("PCR Appeal Br.")), and, on March 22, 2018, the Appellate Division affirmed. *State v. Graciano*, No. A-3723-15T2, 2018 WL 1415607, at *1 (N.J. Super. Ct. App. Div. Mar. 22, 2018).  Petitioner filed a petition for certification (D.E. No. 56-1, PCR Petition for Certification ("PCR Pet. for Certification")), which the New Jersey Supreme Court summarily denied on October 18, 2018.  *State v. Graciano*, 195 A.3d 522 (N.J. 2018).

On November 13, 2018, Petitioner initiated this action *pro se* by filing a petition for writ of habeas corpus with this Court.  (D.E. No. 1).  On September 3, 2019, Petitioner filed an amended petition.  (Am. Pet.).  On September 14, 2020, following an order to answer, Respondents Bruce Davis, the Attorney General for the State of New Jersey, and David Richard answered the Petition. (D.E. No. 31 ("Answer")).

Petitioner subsequently obtained counsel, who submitted a reply brief in support of the Amended Petition on February 23, 2021.  (D.E. No. 43 ("Reply")).  Thereafter, Respondents submitted a supplemental answer in response on October 19, 2021.  (D.E. No. 54 ("Supplemental Answer" or "Suppl. Answer")).  Accordingly, the matter is fully briefed.

## II.    STANDARDS OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), amending 28 U.S.C. § 2254, a district court "shall entertain an application for writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States." 28 U.S.C. § 2254(a). Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *Parker v. Matthews*, 567 U.S. 37, 41 (2012). District courts are required to give great deference to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010). Specifically, district courts must defer to the "last reasoned decision of the state courts on the petitioner's claims." *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (internal quotation marks and citation omitted). Moreover, a federal court reviewing the state court's adjudication under § 2254(d)(1) must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Contrary to clearly established Federal law" means (i) that the state court applied a rule that contradicted the governing law set forth in United States Supreme Court precedent or (ii) that the state court confronted a set of facts that were materially indistinguishable from United States Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is a court's

5

"objectively unreasonable" application of law, not merely a court's erroneous application. *Eley*, 712 F.3d at 846 (quoting *Renico*, 559 U.S. at 773).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 575 U.S. at 316.   Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).   Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

## III.   DISCUSSION

The Amended Petition sets forth nineteen grounds for relief.   (Am. Pet.).   The Court addresses each ground below.

### A.   Due Process Claim Regarding Extraneous Information About the Victim's Pregnancy (Ground One)

In Ground One, Petitioner claims that the trial court violated his rights to a fair and impartial jury when it denied his motion for a mistrial after the jury had found a reference in an exhibit indicating that one of the victims was pregnant when she died.   (Am. Pet. at 9).   The Appellate Division summarized the facts relevant to this claim as follows:

> On the third day of trial, defendant moved for a mistrial because newspaper articles mentioned that [one of the victims] had been pregnant when killed.   It is undisputed that defense counsel and the prosecutor agreed not to introduce this evidence because of its prejudicial nature.   [Trial judge Salem Vincent Ahto, J.S.C.] denied

the motion, holding that defendant's concerns were speculative; he again told the jurors not to read or listen to anything about the case.

After deliberating nearly fourteen hours over several days, the jury sent [Judge Joseph A. Portelli, J.S.C., who sat in for Judge Ahto during deliberations due to a prior commitment,] a note advising that juror fourteen wanted to speak to the court regarding exhibit S–44, a receipt for evidence from the State Police Lab that referred to [the victim] as the "pregnant victim."  Defense counsel acknowledged that he and the prosecutor failed to notice the reference in the document.

Without objection, [Judge Portelli] told the jury to write down the specific question it had regarding S–44.  The jury sent out a note, authored by juror fourteen, who [Judge Portelli] described as "clearly pregnant."  The note indicated that the jury just noticed S–44's reference to [one of the victim's] pregnancy.  Juror fourteen acknowledged telling the other jurors, "I knew that."  She explained [to Judge Portelli] that her husband told her of a newspaper article regarding a case in which a pregnant woman had been shot, but she told her husband she was not permitted to know anything about the case.  Seeing the reference in S–44 caused her to make the link between her husband's comment and this particular case.  The juror showed the other jurors the note before sending it to the judge.

[Judge Portelli] then questioned juror number 14 at length.  She advised that the conversation with her husband took place within the last week, but she initially had not told any other jurors about it.  The juror indicated she could remain fair and impartial.

[Judge Portelli] determined he would give a "strong curative instruction" to the jury.  The State agreed, but defendant renewed his request for a mistrial.  In denying defendant's motion, [Judge Portelli] stated:

> [T]he prejudice resulting from the error is of a nature which can be effectively cured by . . . instruction . . . .
>
> I asked [Juror 14] . . . if she could still be fair and impartial having this knowledge and she said yes she could.
>
> I think that since it's one minor line in

> a lab report which I think is obviously hearsay . . . I think a curative instruction is what should be done here.

[Judge Portelli] provided the following curative charge:

> S–44 contains language specifically and I quote in part, "The pregnant victim, comma, Elisha R. Wordelman," end quote. I instruct you to ignore that phrase. There is no proof submitted in this case . . . that the victim . . . was pregnant at the time that she died. This is considered a hearsay statement, it is not reliable. I instruct you and I instruct you vigorously and as forcefully as I can that you should not consider for any purpose or reason whatsoever that the victim is alleged to have been pregnant at the time of her death.
>
> There has been no proof submitted in this case whatsoever. This case must be decided strictly and solely on the facts and on the law and not on any bias, passion, prejudice, sympathy at all; strictly on the facts as you find them to be.
>
> So . . . in the course of your deliberations and in the course of making your decision you are not to consider that phrase that is written in S–44. It is not evidence and it should be ignored by you and not considered by you in any way.

*Graciano*, 2013 WL 4081017, at *3–4.

Petitioner challenged the court's denial of his renewed motion for a mistrial on direct appeal. (Direct Appeal Br. at 10–19). The Appellate Division ultimately rejected the claim as

follows:

> "[A]n appellate court will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." *State v. Jackson*, 211 N.J. 394, 407, 48 A.3d 1059 (2012) (citation omitted) (alteration in original). As noted above, whether the admission of otherwise inadmissible evidence requires the drastic remedy of a mistrial, or is more appropriately addressed through a curative charge, is peculiarly within the trial court's discretionary authority. *Yough*, supra, 208 N.J. at 397. "[W]hen inadmissible evidence erroneously comes before the jury, an appellate court should not order a new trial unless the error was 'clearly capable of producing an unjust result.'" *Ibid.* (quoting *R.* 2:10–2).

> Here, before deciding to give the curative instruction, [Judge Portelli] spoke to [Judge Ahto] who advised that, in his opinion, a curative instruction was adequate. [Judge Portelli] gave a forceful instruction that we presume the jury followed. *State v. Smith*, 212 N.J. 365, 409, 54 A.3d 772 (2012) (citing *State v. Loftin*, 146 N.J. 295, 390, 680 A.2d 677 (1996)).

> Defendant never asked that juror fourteen be excused, and he does not make that argument before us. Nonetheless, we take this opportunity to note that the procedure used by the judge was entirely appropriate.

> In addressing the nature, extent and impact of a juror's exposure to extraneous information,

>> [t]he court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary.

> [*State v. R.D.*, 169 N.J. 551, 558, 781 A.2d 37 (2001) (citations omitted).]

> Here, the judge thoroughly questioned juror fourteen and determined she was able to continue her fair and impartial

deliberations.  There was no error.

*Graciano*, 2013 WL 4081017, at *4–5.

The New Jersey Supreme Court summarily denied the claim on direct appeal.  *Graciano*, 88 A.3d at 189.  Accordingly, the Court "look[s] through" the summary denial and applies AEDPA's standards to the Appellate Division's determination on direct appeal.  *See Simmons*, 590 F.3d at 231–32.

In his counseled brief in support of his habeas petition, Petitioner argues that, because the information that the victim was pregnant was so "devastatingly prejudicial" and could not be "forgotten," the only fair remedy was a mistrial.  (Reply at 34).  Petitioner also contends that the judge should have questioned Juror 14 as to why she did not disclose her husband's comments to her earlier.  (*Id.* at 35).  Finally, Petitioner argues that it was fundamentally unfair for the Appellate Division to use trial counsel's failure to request the removal of Juror 14 as a reason to affirm the denial of Petitioner's motion for a mistrial because requesting her removal "would cause the rest of the jury to believe that Juror 14 was removed simply because she was pregnant."  (*Id.* at 35–36).  None of these arguments, however, are relevant to the requisite showing for relief under AEDPA.

Critically, Petitioner fails to argue or demonstrate that the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established federal law as set forth by Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).  For example, although Petitioner makes vague references to Supreme Court decisions regarding the presumption of juror bias in cases involving extensive and hostile pretrial publicity, (*see* Reply at 28–29 (citing *Skilling v. United States*, 561 U.S. 358, 363 (2010)); *Patton v. Yount*, 467 U.S. 1025, 1036 (1984); *Irvin v. Dowd*, 366 U.S. 717, 722, 723-25 (1961)), Petitioner fails to explain how the Appellate Division

ran afoul of these cases.  Moreover, the several newspaper articles Petitioner cites as referencing a pregnant victim do not amount to the extensive and hostile media coverage that the Supreme Court has previously found sufficient to require a presumption of prejudice.  *See, e.g.*, *Irvin*, 366 U.S. at 725.[3]

By way of another example, although Petitioner cites *Smith v. Phillips*, 455 U.S. 209, 217 (1982) for the proposition that due process requires "a jury capable and willing to decide the case solely on the evidence before it," Petitioner fails to explain how the Appellate Division contradicted or unreasonably applied *Smith*.  In *Smith,* a sitting juror submitted an application for employment as an investigator for the district attorney's office responsible for trying the defendant's case.  *Smith*, 455 U.S. at 212.  The district attorney revealed this information only after the jury had convicted the defendants.  *Id.* at 213.  The trial court held a post-verdict hearing in

---

[3]         In describing the extent of the publicity in *Irvin*, the Supreme Court noted that:

> [Irvin's] first motion for a change of venue from Gibson County alleged that the awaited trial . . . had become the *cause ce le bre* of this small community—so much so that curbstone opinions, not only as to [Irvin's] guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations.  A reading of the 46 exhibits which [Irvin] attached to his motion indicate[d] that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial.  The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville Radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents.

*Irvin*, 366 U.S. at 725 (emphasis added).  Moreover, the Supreme Court explained that the *voir dire* examination of the jurors ultimately placed in the jury box further reflected the "pattern of deep and bitter prejudice" within the community:

> Two-thirds of the jurors had an opinion that [Irvin] was guilty and were familiar with the materials and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief.  One said that he "could not . . . give [Irvin] the benefit of the doubt that he is innocent."  Another stated that he had a "somewhat" certain fixed opinion as to [Irvin's] guilt.

*Id.* at 727–28.

which it determined that the pending application had not influenced the juror and denied the defendant's motion for a new trial. *Id.* at 213–14. The defendant eventually applied for federal habeas relief, contending that the trial court improperly relied on the testimony of the juror at the hearing to ascertain his impartiality. *Id.* at 214. When the matter reached the Supreme Court, it held that the post-trial hearing held by the trial court was constitutionally sufficient under the circumstances to decide the allegation of juror partiality. *See id.* at 217.

In this matter, the Appellate Division found that "the judge thoroughly questioned juror fourteen and determined she was able to continue her fair and impartial deliberations." *Graciano*, 2013 WL 4081017, at *5. To the extent that the holding in *Smith* applies to cases, like here, involving allegations of jury bias arising pre-verdict, the Appellate Division's determination that the trial court's inquiry into the allegations of jury taint satisfied due process is not contrary to, nor an unreasonable application of, *Smith*.

Petitioner also fails to demonstrate that the Appellate Division's determination is based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). The trial court's findings as to juror impartiality are presumptively correct under 28 U.S.C. § 2254(d). *See Smith*, 455 U.S. at 218 (noting that the trial judge's finding that a juror's application for employment in the district attorney's office responsible for trying the defendant's case "in no way reflected . . . an inability to consider the guilt or innocence of the [defendant] solely on the evidence" is presumptively correct under 28 U.S.C. § 2254(d)). As Petitioner fails to provide any evidence, let alone clear and convincing evidence, to rebut the trial court's finding that Juror 14 was capable and willing to remain impartial, this Court must accept that finding as true. *See id.* Moreover, as stated by the Appellate Division, the record demonstrates that the trial court's finding was reasonable. Juror 14 gave no indication that she could not remain fair and impartial. (*See* D.E. No. 27-2, February 23,

2011, Trial Tr. at 14:12–19:15).  Accordingly, Petitioner fails to make either showing for habeas relief under AEDPA, and the Court denies Petitioner relief on Ground One.

**B.      Due Process Claim Regarding Petitioner's Incarceration Status (Ground Two)**

In Ground Two, Petitioner alleges that he was denied his right to a fair trial because witness Angie Rodriguez informed the jury that Petitioner had been incarcerated for a significant period. (Am. Pet. at 11).

On recross-examination at trial, defense counsel asked witness Angie Rodriguez whether she had any doubts in late July and August 2007 that Petitioner was the shooter.  (D.E. No. 23-2, January 24, 2011, Trial Tr. at 216:24–217:22).  She admitted that she did.  (*Id.*).  Defense counsel then asked Rodriguez whether she had doubts "[u]p until August 14," the day she gave her statement to police.  (*Id.*).  Rodriguez responded: "I'm not sure.  I mean, maybe I did have a doubt, *but he never got released from prison*."  (*Id.* (emphasis added)).  The trial judge subsequently struck Rodriguez's reference to Petitioner's incarceration and instructed the jury that it could not "use it in any manner or any fashion during the course of your deliberations."  (*Id.* at 217:23–220:11).  Neither party objected to the instruction.  (*See id.*).

On direct appeal, Petitioner argued that Rodriguez's reference to Petitioner's extended incarceration compromised his right to a fair trial.  (Direct Appeal Br. at 20–23).  The Appellate Division analyzed Petitioner's argument as follows:

> "[W]hether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters 'peculiarly within the competence of the trial judge.'"  *State v. Yough*, 208 N.J. 385, 397, 31 A.3d 271 (2011) (quoting *State v. Winter*, 96 N.J. 640, 646-47, 477 A.2d 323 (1984)).  Therefore, "when inadmissible evidence erroneously comes before the jury, an appellate court should not order a new trial unless the error was clearly capable of producing an unjust result."  *Id.* at 397–98.
>
> Here, the remark was fleeting and made in response to defense

13

counsel's persistent questioning.  The judge *sua sponte* called for a sidebar and provided a curative instruction to which there was no objection.  There was no error.

*Graciano*, 2013 WL 4081017, at *3.

The New Jersey Supreme Court summarily denied this claim on direct appeal.  *Graciano*, 88 A.3d at 189.  Accordingly, the Court applies AEDPA's standards to the Appellate Division's determination on direct appeal.  *See Simmons*, 590 F.3d at 231–32.

In his counseled brief in support of his habeas petition, Petitioner argues that "the prejudicial effect of this testimony was so damaging that the following curative instruction was simply insufficient to remove the resulting stain upon [Petitioner]."  (Reply at 38).  Petitioner also argues that the Appellate Division erred in affirming the trial court because the testimony, "unlike an off the cuff remark about a defendant's imprisonment, was directly aimed at being the reason for [Petitioner's] guilt."  (*Id.* at 39).

Petitioner once again fails to argue or demonstrate that the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  Although Petitioner vaguely references *Smith* for the proposition that due process requires that "a jury be capable and willing to decide the case solely on the evidence before it," (Reply at 30), Petitioner fails to cite, and the Court is unaware of, any Supreme Court case holding that the mere mention of the fact that a defendant is in custody constitutes a due process violation.  Moreover, the isolated nature of the reference is not the sort of "constant reminder" to the jury of a defendant's custody status which the Supreme Court has held in other circumstances violates due process.  *See Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (holding that requiring a defendant to stand trial in prison garb violates due process).  Further, Petitioner does not argue that the Appellate Division's

14

determination was based on an unreasonable determination of the facts.  Accordingly, Petitioner

fails to make the requisite showing for relief under AEDPA, and the Court denies Petitioner relief

on Ground Two.

### C.      Excessive Sentence Claim (Ground Three)

In Ground Three, Petitioner asserts that the trial judge violated his constitutional rights by

imposing an excessive sentence.  (Am. Pet. at 12).  Specifically, Petitioner contends that the

sentencing court failed to consider his age at the time of the incident, failed to consider that

Petitioner would be deported upon his release, and improperly imposed a consecutive sentence for

what Petitioner considers to be "one crime[,] one incident."  (*Id.*).

Petitioner raised this claim on direct appeal.  (Direct Appeal Br. at 24–33).  The Appellate

Division analyzed the claim in pertinent part as follows:

> At sentencing, the judge found as aggravating factors, the risk that
> defendant would re-offend, defendant's prior criminal history, and
> the need for deterrence.  N.J.S.A. 2C:44-1(a)(3), (6), and (9).  The
> judge found no mitigating factors.  N.J.S.A. 2C:44-1(b).  The judge
> also noted that the circumstances of the crimes were "especially
> suitable" for the imposition of consecutive sentences:
>
>> The crimes involve separate acts of
>> violence.   There   were   multiple
>> victims.  There has been numerous
>> convictions here, and there can be no
>> free crimes in a system for which
>> punishment shall fit the crime.
>
> Defendant claims that the sentence imposed was manifestly
> excessive.  In particular, he argues that two of the three aggravating
> factors, his prior criminal record and the risk that he would commit
> another offense, were not supported by the record.  In addition, he
> argues that the judge should have considered his youth—he had just
> turned twenty at the time of the offenses—as a non-statutory
> mitigating factor.
>
> Defendant further claims that consecutive sentences were
> inappropriate under the guidelines established in *State v. Yarbough*,

100 N.J. 627, 643-44, 498 A.2d 1239 (1985), *cert. denied*, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).  Defendant contends that the murder of Wordelman and the aggravated assault upon Roberts were part of a single criminal episode and "did not involve separate acts of violence . . . ."

"Appellate review of the length of a sentence is limited." *State v. Miller*, 205 N.J. 109, 127, 12 A.3d 873 (2011).  We assess whether the aggravating and mitigating factors were based upon "competent credible evidence in the record." *Ibid.* (quotations and citation omitted).  We do not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment." *Ibid.* (quoting *State v. Bieniek*, 200 N.J. 601, 608, 985 A.2d 1251 (2010)).  When the judge has followed the sentencing guidelines, and his findings of aggravating and mitigating factors are supported by the record, we will only reverse if the sentence "shocks the judicial conscience" in light of the particular facts of the case.  *State v. Roth*, 95 N.J. 334, 364, 471 A.2d 370 (1984); *accord State v. Cassady*, 198 N.J. 165, 183-84, 966 A.2d 473 (2009).

Defendant had a prior conviction from 2005 for aggravated assault and unlawful possession of a weapon, for which he received a five-year term of probation.  In 2006, he was charged with aggravated assault and weapons possession and was on bail at the time of the offense in this case.  A violation of probation was also pending. Aggravating factors three, six and nine were amply supported by the record.

Age of a defendant is not a statutory mitigating factor.  *Bieniek, supra*, 200 N.J. at 610.  Nonetheless, the judge was "mindful" of defendant's age and undoubtedly incorporated it in the calculus used to impose sentence.  In short, the aggravating factors were supported by the record, the judge considered defendant's youth, and the sentence imposed does not shock the judicial conscience or otherwise reflect a mistaken exercise of the judge's broad discretion.

"When a sentencing court properly evaluates the *Yarbough* factors in light of the record, the court's decision will not normally be disturbed on appeal. . . .  However, if the court does not explain why consecutive sentences are warranted, a remand is ordinarily needed for the judge to place reasons on the record." *Miller, supra*, 205 N.J. 129 (citations omitted).

The *Yarbough* factors are well-known:

> (1) There should be no "free crimes"

in a system where punishment fits the crime.

(2) The reasons for consecutive or concurrent sentences should be separately given.

(3) The court should consider the facts of the crime, including whether:

(a) the crimes and their objectives were independent of each other;

(b) the crimes involved separate acts of violence;

(c) the crimes were committed at separate times or places, rather than indicating a single period of aberrant behavior;

(d) the crimes involved multiple victims;

(e) the convictions are numerous.

(4) There should be no double counting of aggravating factors.

(5) Successive terms for the same offense should ordinarily not equal the punishment for the first offense.

[*Yarbough, supra*, 100 N.J. at 643-44.]

These factors should be applied qualitatively, not quantitatively. *State v. Carey*, 168 N.J. 413, 427, 775 A.2d 495 (2001). The focus is on the gravity of the offense. *Id.* at 422. A court may impose consecutive sentences even though a majority of the *Yarbough* factors support concurrent sentences. *Id.* at 427-28; *see also State v. Swint*, 328 N.J. Super. 236, 264, 745 A.2d 570 (App. Div. [2000]) (even when offenses are connected by a "unity of specific purpose," "somewhat interdependent of one another," and "committed within a short period of time," concurrent sentences need not be imposed) (internal quotation marks omitted), *certif. denied*, 165 N.J. 492, 758 A.2d 651 (2000). Crimes involving multiple deaths or victims who have sustained serious body injuries represent especially suitable circumstances for the imposition of consecutive sentences. *Carey, supra*, 168 N.J. at 428.

We find no mistaken exercise of the judge's discretion in imposing

consecutive sentences.

*Graciano*, 2013 WL 4081017, at *7–9.

The New Jersey Supreme Court summarily denied this claim on direct appeal. *Graciano*, 88 A.3d at 189. Accordingly, the Court applies AEDPA's standards to the Appellate Division's determination on direct appeal. *See Simmons*, 590 F.3d at 231–32.

In his counseled brief in support of his habeas petition, Petitioner argues that "the sentence imposed was arbitrary and capricious and in violation of the Due Process Clause of the Fifth Amendment" because "[t]he court failed to provide support for the finding of the two aggravating factors and did not thoroughly consider the mitigating factor of his youth at the time of the incident." (Reply at 40–41). Petitioner also argues that the imposition of a fifty-five-year term on the murder count and a consecutive ten-year term on another count resulted in an excessive sentence. (*Id.* at 41).

"[A] person who has been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual . . . and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." *Chapman v. United States*, 500 U.S. 453, 465 (1991). A sentence is not cruel and unusual so long as it is not "grossly disproportionate to the severity of the crime." *Ewing v. California*, 538 U.S. 11, 21 (2003).

Here, the record demonstrates that the sentence imposed was not arbitrary. *See Chapman*, 500 U.S. at 465. The trial court adequately explained its basis for the sentence, including its basis for imposing a consecutive sentence and the reasons for finding several aggravating factors but no mitigating factors. (D.E. No. 28-2, Sentencing Transcript at 19:23–28:12). Contrary to Petitioner's assertions, the sentencing court did consider Petitioner's age. (*Id.* at 22:11 ("I am

mindful of his age . . . .")).  And Petitioner fails to demonstrate why his potential deportation is a relevant sentencing factor.  Finally, Petitioner does not contend that the sentence imposed exceeded the statutory maximum or is grossly disproportionate to the crime Petitioner committed. *Ewing*, 538 U.S. at 21.  Accordingly, Petitioner fails to demonstrate that the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d), and the Court will deny Petitioner relief on Ground Three.

### D. Due Process Claim Regarding Ambiguous Jury Instruction (Ground Four)

In Ground Four, Petitioner alleges that his constitutional rights were violated because of a "flawed and vague jury instruction."  (Am. Pet. at 14).  Although Petitioner's exact argument is unclear, it appears that Petitioner takes issue with how the trial court instructed the jury on knowing and purposeful murder.  (*See id.*).  For example, Petitioner asserts that:

> During deliberation[,] the jury asked for the definition of knowing and purposeful[] three times . . . and three times the trial court charged the jury with murder and . . . gave them a written definition of a deadly weapon that read[s] as follow[s]:
>
> > A homicide or a killing with a deadly weapon, such as a handgun in itself would permit you to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death.  A deadly weapon is any firearm or other weapon, which in the manner it is used or is intended to be used, is known to capable of producing death or serious bodily injury.

(*Id.*).  Petitioner offers no further explanation of his claim.  (*See id.*).

Petitioner raised this argument *pro se* on direct appeal, (*Pro Se* Suppl. Direct Appeal Br. at 19), and the Appellate Division analyzed it as follows:

> We have difficulty discerning some of the arguments made
> in defendant's *pro se* brief.  For example, he claims that the
> jury instructions regarding knowing and purposeful murder
> were "flawed and vague."  However, defendant cites to no
> particular offending portion of the charge, and our review
> indicates the instructions essentially complied with the
> model charge.

*Graciano*, 2013 WL 4081017, at *5.

The New Jersey Supreme Court summarily denied this claim on direct appeal.  *Graciano*, 88 A.3d at 189.  Accordingly, the Court applies AEDPA's standards to the Appellate Division's determination on direct appeal.  *See Simmons*, 590 F.3d at 231–32.

Here, Petitioner makes no attempt to explain, and the Court cannot discern, how the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established law or was based on an unreasonable determination of the facts.[4]  For this reason, Petitioner's claim fails.  *See* 28 U.S.C. § 2254(d).

Moreover, even under a *de novo* review, the claim still fails.  Habeas review of jury instructions is limited to those instances where the instructions violated a defendant's due process rights.  *See Estelle v. McGuire*, 502 U.S. 62, 72–73 (1991) ("The only question for us [in reviewing an allegedly erroneous jury instruction is] whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.").  Here, the record demonstrates that the instructions provided to the jury regarding a defendant's intent mirrored the model jury charges, (*compare Model Jury Charges (Criminal)*, "Murder" N.J. Stat. §§ 2C:11-3a(1), -3a(2), *with* D.E. No. 26-2, February 14, 2011, Trial Tr. at 90:4–92:14), and the Court cannot discern any

---

[4]    In addressing Ground Four in his counseled brief in support, Petitioner appears to assert a claim that he did not raise in the Amended Petition.  Specifically, Petitioner appears to take issue with the trial court's instruction to the jury emphasizing that all jurors were to participate after one of the jurors indicated that another was not taking the matter seriously.  (Reply at 41–43).  This claim will not be considered because a habeas petitioner cannot raise new claims in a traverse.  *See Johnson v. D'Ilio*, No. 15-2641, 2018 WL 4442221, at *3 n.1 (D.N.J. Sept. 17, 2018).

flaw in the model jury charges that would have violated Petitioner's due process rights. Accordingly, the Court will deny Petitioner relief on Ground Four.

> **E.   Due Process Claim Regarding the Court's Alleged Failure to Answer the Jury's Unanimous Verdict Question (Ground Five)**

In Ground Five, Petitioner alleges that the trial court violated his constitutional right to a fair trial by failing "to guide the jury and answer their questions" regarding whether their verdict needed to be unanimous on all counts. (*See* Am. Pet. at 16).

Prior to the start of deliberations, the trial court instructed the jury that the verdict "must represent the considered judgment of each juror and must be unanimous as to each charge." (Feb. 14, 2011, Trial Tr. at 70:7). The trial court further explained that:

> It's your duty as jurors to consult with one another and to deliberate with a view in reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself and you do so only after an impartial consideration of the evidence. And you do that with your fellow jurors.
>
> In the course of your deliberations, do not hesitate to re-examine your own view and change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence [because] of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
>
> . . .
>
> Furthermore, before a defendant can be convicted of any charge, all 12 of you must agree that each and every element as I've just gone over those elements that are required for a conviction has been proven and proven beyond a reasonable doubt.

(*Id.* at 70:10–71:25).

Nonetheless, on the seventh day of deliberations, the jury sent out the following note to the judge:

> If we decided on six of the seven counts including number one, do we have to come to an agreement on all seven, or is it a hung jury?

> We're not saying we can't on the one we're missing, but we haven't
> so far.

*Graciano*, 2013 WL 4081017, at *5.  Over defendant's objection, the judge indicated that he did

not intend to respond, in part, because the jury did not state it was deadlocked.  *Id.*  Before the

judge actually ruled, however, the jury sent out another note stating:  "You can disregard the other

question.  We have reached a verdict."  *Id.*

Petitioner raised this claim *pro se* on direct appeal.  (*Pro Se* Suppl. Direct Appeal Br. at 1–

10).  The Appellate Division rejected the claim, determining that the judge did not err in failing to

answer the jury's question "because, before the judge had a chance to respond to the first note, the

jury indicated it had reached a unanimous verdict."  *Graciano*, 2013 WL 4081017, at *5.

The New Jersey Supreme Court summarily denied the claim on direct appeal.  *Graciano*,

88 A.3d at 189.  Accordingly, the Court applies AEDPA's standards to the Appellate Division's

determination on direct appeal.  *See Simmons*, 590 F.3d at 231–32.

In his counseled brief in support of his habeas petition, Petitioner argues that the trial

court's failure to respond to the jury's note "was extremely ambiguous."  (Reply at 44).  "[B]y not

addressing the jury's question," Petitioner contends, "there was a reasonable likelihood that the

jury applied this 'silence' in a way that relieved the State of its burden of proving every element

of the crime beyond a reasonable doubt."  (*Id.* (citing *Waddington v. Sarausad*, 555 U.S. 179, 190–

91 (2009))).

Although Petitioner's counseled brief is not clear on this point, Petitioner appears to argue

that the Appellate Division's determination is an unreasonable application of *Waddington*.  As

noted above, an improper jury instruction may be adequate grounds for issuance of a writ of habeas

corpus where the instruction violates a defendant's right to due process of law.  *Cupp v. Naughten*,

414 U.S. 141, 146 (1973).  To show a due process violation, a defendant must show some

22

ambiguity, inconsistency, or deficiency in the instruction and that there was a "reasonable likelihood" that the jury "applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington*, 555 U.S. at 191. In making this determination, the jury instruction must not be considered in isolation but rather in the context of the instructions as a whole and the trial record. *Id.*

However, even if the trial court's silence constituted an ambiguous jury instruction or made the trial court's prior instruction on a unanimous verdict ambiguous, Petitioner fails to demonstrate a reasonable likelihood that the jury applied the trial court's instruction in a way that operated to lift the State's burden of proving every element beyond a reasonable doubt. In fact, Petitioner fails to point to, and the record is completely devoid of, any evidence suggesting that the verdict was not the judgment of each juror as to each charge or that the trial court's failure to respond had any effect on the jury. Therefore, the Appellate Division's determination is not an unreasonable application of *Waddington*, and the Court will deny Petitioner relief on Ground Five.

## F.   Prosecutorial Misconduct Claim (Ground Six)

In Ground Six, Petitioner argues that the prosecutor's alleged misconduct violated his constitutional rights to a fair trial. (Am. Pet. 17–18). Specifically, Petitioner identifies three different instances that the prosecutor's actions may be construed as misconduct. (*Id.*). *First*, he alleges that the prosecutor biased the jury by referring to witness Carlos Rodriguez as a "rat." (*Id.*; *Pro Se* Suppl. Direct Appeal Br. at 15). *Second*, Petitioner alleges that the prosecutor falsely told the trial court that her office had no prior knowledge of Wilmer Marte and Emanual Jacquez's statements that Petitioner told them not to talk about the shooting and that he would "man up" and take responsibility for it. (Am. Pet. at 17–18). *Third*, Petitioner complains that, during closing argument, the prosecutor told the jury to consider the victims' rights and communicated to the jury that the victims were also entitled to a fair trial. (*Id.*).

Petitioner vaguely asserted this claim and the above arguments, among other prosecutorial acts not asserted in the Amended Petition, in his *pro se* supplemental brief on direct appeal. (*Pro Se* Suppl. Direct Appeal Br. at 15, 18–19 & 33–34). The Appellate Division noted that it had difficulty "discerning some of the arguments made in defendant's *pro se* brief." *Graciano*, 2013 WL 4081017, at *5. Although the Appellate Division did not explicitly address the above alleged acts in rejecting Petitioner's prosecutorial misconduct claim, it denied Petitioner relief, and, therefore, without any indication to the contrary, adjudicated his prosecutorial misconduct claim on the merits. *Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Thereafter, the New Jersey Supreme Court summarily denied the claim on direct appeal. *Graciano*, 88 A.3d at 189. Accordingly, the Court applies AEDPA's standards to the Appellate Division's determination on direct appeal. *See Simmons*, 590 F.3d at 231–32.

Here, Petitioner fails to demonstrate or argue that the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established law or was based on an unreasonable determination of the facts.[5] For this reason, Ground Six fails. *See* 28 U.S.C. § 2254(d).

Nonetheless, even under *de novo* review, the claim still fails. In evaluating claims of prosecutorial misconduct, courts "consider[] whether the prosecutors' comments so infected the

---

[5] In addressing Ground Six in Petitioner's counseled brief in support of his habeas petition, Petitioner once again appears to assert a claim that he did not raise in the Amended Petition. Specifically, Petitioner argues that the prosecutor inappropriately stated during summation that Petitioner's counsel admitted that Petitioner shot the gun. This claim will not be considered because a habeas petitioner cannot raise new claims in his traverse. *Johnson*, 2018 WL 4442221, at *3 n.1.

24

trial with unfairness as to make the resulting conviction a denial of due process." *Fahy v. Horn*, 516 F.3d 169, 198 (3d Cir. 2008).  To rise to the level of a denial of due process, "the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987).

Here, the Court finds that the alleged acts are either unsupported by the record or were not significant enough to deny Petitioner's right to a fair trial.  In Petitioner's first argument, he contends that the prosecutor biased the jury by calling Rodriguez a "rat."  (Am. Pet. 17–18).  On cross examination of witness Carlos Rodriguez, the prosecutor asked Rodriguez whether he and Petitioner have some friends in common.  (D.E. No. 23-4, January 31, 2011, Trial Tr. at 59:11–60:12).  When Rodriguez responded, "[m]aybe we do," the prosecutor stated, "[b]ut you're not going to tell us here today, are you, because you don't want to be known as a rat?"  (*Id.*).  Petitioner's counsel objected, and the Court struck the comment and told the jury not to use it during their deliberations.  (*Id.*).

Notwithstanding Petitioner's argument, the prosecutor did not call Rodriguez a rat.  Rather, the prosecutor implied that Rodriguez was not fully answering questions for fear of being labeled as a rat.  (*Id.*).  Moreover, the Court struck the comment and issued a curative instruction.  (*Id.*).  The Court finds, therefore, that the prosecutor's reference to a rat was harmless, and Petitioner fails to offer anything other than mere speculation that the statement biased the jury.

In Petitioner's second argument, he contends that the prosecutor falsely told the trial court that her office had no prior knowledge of statements from Wilmer Marte and Emanuel Jacquez that Petitioner told them not to talk about the shooting and that he would "man up" and take responsibility.  (Am. Pet. 17–18).  Petitioner contends that the trial court admitted these statements

based on the prosecutor's false representation.  (*Id.*).

From what the Court can discern, the parties had prior knowledge of a conversation between Wilmer Marte, Emmanual Jacquez, and Petitioner that took place two or three days after the shooting.  (D.E. No. 22-2, January 20, 2011, Trial Tr. vol. II at 223:13–224:24).  During the conversation, Petitioner told Marte and Jacquez that he would "man up" and take responsibility for his actions.  (*Id.*).  The Court held a hearing pursuant to Rule 104(c) of the New Jersey Rules of Evidence to determine whether the statement was admissible.  (*Id.*).  The Court concluded it was admissible and permitted the prosecutor to present the statement to the jury.  (*Id.*).  The prosecutor subsequently called Marte, and Marte testified regarding what Petitioner had said during the conversation.  (D.E. No. 22-3, January 21, 2011, Trial Tr. at 45:13–47:17).

The prosecutor later called Jacquez, the other participant in the conversation, to testify as well.  (January 31, 2011, Trial Tr. at 98:13–14).  During his testimony, however, Jacquez spoke of a second conversation between himself, Carlos Rojas, and Petitioner that took place the day after the first conversation.  (*Id.* at 151:9–156:10).  In the second conversation, Petitioner once again stated that he would take responsibility for his actions.  (*Id.*).  Petitioner's counsel objected, and the Court held another Rule 104(c) hearing.  (*Id.* at 156:12–194:20).  Petitioner's counsel claimed that he had no prior knowledge of this second conversation and indicated that the prosecutor had not disclosed it in discovery.  (*Id.*).  In response, the prosecutor asserted that her office had no prior knowledge of this second conversation because none of the witnesses had mentioned it during pretrial preparations.  (*Id.*).  The trial court "accept[ed] the representation that the State did not have this information" previously and permitted the prosecutor to present evidence of the second conversation to the jury.  (*Id.*).

The Court finds Petitioner's argument that the trial court admitted the statements based on

26

the prosecutor's false representation to be entirely meritless.  Petitioner fails to present any evidence that the prosecutor or her office had knowledge of the second conversation prior to Jacquez's testimony.

Finally, with respect to Petitioner's third argument that the prosecutor told the jury to consider the victims' rights, the prosecutor stated as follows during her summation:

> We all greatly appreciate the effort that you're making to do this job for us and I'm sure . . . Mr. Graciano does as well.  And I also want you to know that Elisha Wordelman and Jamar and John Boyd and Evy and Byron Stevenson they appreciate that you're doing this as well, because although we start always and we say, well, you know, the defendant is entitled to a fair trial?  You know who else is entitled to a fair trial?  Elisha, Jamar, John, Evy.  They're entitled to fair [sic] too.

(D.E. No. 25-1, February 8, 2011, Trial Tr. vol. II at 82:21–83:6).  Although perhaps inappropriate, these comments were fleeting and were not of sufficient significance to deny Petitioner's right to a fair trial.  *See Greer*, 483 U.S. at 765.  Because Petitioner fails to demonstrate that he is entitled to relief under AEDPA's deferential standard, and the Court finds that two of the alleged acts of prosecutorial misconduct did not occur and that the third alleged act did not deny Petitioner's right to a fair trial, the Court denies Petitioner habeas relief on Ground Six.

### G.    *Brady* Claim (Ground Seven)

In Ground Seven, Petitioner argues that the prosecutor and the State's agents failed to disclose certain exculpatory evidence to the defense.  (*See* Am. Pet. at 19).  Specifically, Petitioner contends that Detective Scott Heath's failure to record Angie Rodriguez and Carlos Rojas's initial statements to police, wherein they denied that they were present during the shooting, constitutes the suppression of exculpatory evidence.  (*Id.*).

Detective Heath testified at trial that he did not record the entirety of Carlos Rojas's initial conversation with him at the police station.  (*See* D.E. No. 23-5, February 5, 2011, Trial Tr. at

193:22–195:22).   According to Detective Heath, it was his office's practice to record only a witness's formal, sworn statement and not the preliminary interview.  (*See id.*).  Detective Heath testified that, during the unrecorded preliminary interview, Carlos Rojas initially indicated that he was not present in the van around the time of the shooting.  (*See id.* at 196:4–18).  During his recorded formal statement, however, Carlos Rojas indicated that he was in the van and that Petitioner was the shooter.  (*See* January 31, 2011, Trial Tr. at 12:21–29:20).  Angie Rodriguez also testified at trial that her initial statement to the police, wherein she indicated that she was not present during the shooting, was not recorded in her formal statement that she made at the police station.  (*See* D.E. No. 23-1, January 24, 2011, Trial Tr. at 186:12–188:14).  However, in her formal statement, Angie Rodriguez indicated that she was in the van and that Petitioner was the shooter.

Petitioner vaguely raised this claim *pro se* on direct appeal.  (*See Pro Se* Suppl. Direct Appeal Br. at 28–30).  The Appellate Division denied Petitioner relief without specifically discussing the factual predicate discussed above.  *See Graciano*, 2013 WL 4081017, at \*7.  Thereafter, the New Jersey Supreme Court summarily denied the claim on direct appeal.  *See Graciano*, 88 A.3d at 189.  Accordingly, the Court applies AEDPA's standards to the Appellate Division's determination on direct appeal.  *See Harrington*, 562 U.S. at 99; *Simmons*, 590 F.3d at 231–32.

Here, Petitioner fails to demonstrate or argue that the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established law or was based on an unreasonable determination of the facts.[6]  Accordingly, Ground Seven fails.  *See* 28 U.S.C. § 2254(d).

---

[6]      In addressing Ground Seven in his Brief in Support, Petitioner appears to assert a claim that he did not raise in the Amended Petition.  Specifically, Petitioner argues that "the State failed to turn over evidence of a video tape

Moreover, Petitioner's claim also fails under *de novo* review. Due process forbids a prosecutor from suppressing evidence favorable to an accused. *Brady v. Maryland*, 373 U.S. 83 (1963). The prosecution's duty to disclose includes evidence that goes to the credibility of crucial prosecution witnesses, *Giglio v. United States*, 405 U.S. 150, 154 (1972), and information "known to the others acting on the government's behalf in the case," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "To establish a due process violation under *Brady*, then, a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005) (citing *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997)). A prosecutor, however, need not "furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) (citing *United States v. Campagnuolo*, 592 F.2d 852, 861 (5th Cir. 1979)).

Here, Petitioner fails to demonstrate that the prosecutor suppressed the initial statements made by Angie Rodriguez or Carlos Rojas. For example, Petitioner fails to provide any evidence to show that the defense did not already possess or know of the statements prior to trial. Moreover, even if he did not already possess this information, Petitioner could have readily obtained it with reasonable diligence by questioning the witnesses. *See Starusko*, 729 F.2d at 262. Accordingly, the Court denies Petitioner habeas relief on Ground Seven.

### H. Ineffective Assistance of Trial Counsel Claim for Alleged Failure to Investigate, Failure to Advise Petitioner of a Plea Offer, and Coercing Petitioner not to Testify (Ground Eight)

In Ground Eight, Petitioner alleges that his trial counsel provided ineffective assistance by:

---

that was recording the area around School 24 which showed him getting into a green van rather than a white van; a separate bullet shell casing that was recovered at the time of the shooting; and phone records between him and Lantigua." (Br. in Supp. at 49). This claim will not be considered because a habeas petitioner cannot raise new claims in his traverse. *See Johnson*, 2018 WL 4442221, at *3 n.1.

(i) failing to investigate the case by not interviewing Oneida Rodrigues, Lizabeth Rivera, and Sofia Urena; (ii) failing to advise Petitioner of a plea offered by the State; and (iii) coercing Petitioner not to testify on his behalf.  (*See* Am. Pet. at 20).  With respect to Petitioner's first argument, he claims that Oneida Rodrigues "told police that she had seen the victim in an altercation that came out of a party in the river view towers project." (*Id.*).  He also claims that Lizbeth Rivera "was the only eyewitness to the alleged touching of Elizabeth Lantigua and would have testif[ied] that it did not happen[]." (*Id.*).

As an initial matter, Petitioner failed to exhaust this claim in state court.  A federal court may not grant a writ under Section 2254 unless the petitioner has first "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A); *see also Rose v. Lundy*, 455 U.S. 509, 515 (1982); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997), *cert. denied*, 532 U.S. 919 (2001).  To meet the exhaustion requirement, a petitioner must "fairly present" his federal claims to each level of the state courts empowered to hear them, either on direct appeal or in collateral post-conviction proceedings.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999).  This means that the petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts [the state courts] on notice that a federal claim is being asserted." *McCandles v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  "It is not enough that all the facts necessary to support the federal claim were before the state courts." *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981))).  A petitioner generally bears the burden to prove all facts establishing exhaustion.  *See Toulson v. Beyer*, 987 F.2d 984, 987 (3d Cir. 1993) (citing

*Landano v. Rafferty*, 897 F.2d 661, 688 (3d Cir. 1990) *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 23 (1990).

Here, Petitioner failed to raise his failure to investigate claim and plea offer claim on PCR appeal before the Appellate Division.  (*See* PCR Appeal Br.).  Moreover, Petitioner failed to raise the coercion claim in his PCR petition for certification before the New Jersey Supreme Court.  (*See* PCR Pet. for Certification).  Likewise, Petitioner did not raise any of these claims on direct appeal. (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.).  Accordingly, Petitioner failed to exhaust his claims before the state courts.  *See O'Sullivan*, 526 U.S. at 847.

Nevertheless, a habeas court can, if appropriate, deny a petitioner's unexhausted claims on the merits pursuant to 28 U.S.C. § 2254(b)(2).  *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007).  Where, as here, the state courts have not "reached the merits of a claim thereafter presented to a federal habeas court," the federal court must "conduct a *de novo* review over pure legal questions and mixed questions of law and fact . . . ."  *Id.* at 429.  Even on *de novo* review of a habeas claim, however, the state court's factual determinations are still presumed to be correct, unless a petitioner rebuts them with clear and convincing evidence.  *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).

With these principles in mind, the Court proceeds to analyze Petitioner's unexhausted claims on the merits.  The two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington* governs Petitioner's claims of ineffective assistance of counsel.  466 U.S. 668, 687 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. . . . This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  A

petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.  To establish prejudice, a petitioner "need not establish that the attorney's deficient performance more likely than not altered the outcome" of the petitioner's case, but only that there is a reasonable probability of such an effect upon the outcome of the case. *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).

With respect to Petitioner's argument that his counsel was deficient for failing to interview certain witnesses, Petitioner fails to establish any prejudice.  For example, Petitioner asks this Court to speculate as to what certain witnesses saw and would have testified to, without any evidence in support.  For this reason, Petitioner's first argument fails.  *See Duncan v. Morton*, 456 F.3d 189, 201 (3d Cir. 2001) (denying ineffective assistance of counsel claim for failure to interview a witness where petitioner failed to present any sworn testimony from the witness as to what his testimony would have been).

Next, regarding Petitioner's argument that his counsel failed to advise Petitioner of a plea deal offered by the State, the PCR trial court found that trial counsel communicated any plea offers that were made to him to Petitioner.  (PCR Ct. Decision at 5:3–19).  As Petitioner fails to present any evidence, let alone clear and convincing evidence, to rebut the state court's finding, the Court must accept it as true.  *See* 28 U.S.C. § 2254(e)(1).  Moreover, the PCR trial court's finding that counsel communicated any plea offers to Petitioner was reasonable.  Petitioner's trial counsel testified at the PCR hearing that he informed Petitioner of the State's plea offer, and nothing in the record indicates otherwise.  (PCR Hr'g Tr. at 9:23–12:8).  Accordingly, this argument fails as well.

Finally, as to Petitioner's argument that his counsel coerced him not to testify, the PCR court found that Petitioner made a knowing and conscious decision not to testify with advice from

counsel.  (PCR Ct. Decision at 6:2–11).  Once again, Petitioner fails to present any evidence, let alone clear and convincing evidence, to rebut the state court's finding.  *See* 28 U.S.C. § 2254(e)(1).  Moreover, this finding was reasonable considering Petitioner's colloquy with the trial court regarding his decision not to testify.  (*See* D.E. No. 24-2, February 7, 2011, Trial Tr. at 69:2–72:16).  Accordingly, Petitioner's third argument also fails. The Court denies Petitioner habeas relief on Ground Eight.

## I.      Ineffective Assistance of Appellate Counsel Claim (Ground Nine)

In Ground Nine, Petitioner claims that his Appellate counsel "refused to raise issues [P]etitioner requested to be raised[,] and[,] in the issue of the tainted jury[,] counsel argued as if only one juror was tainted when all twelve were."  (*See* Am. Pet. at 21).

Petitioner failed to exhaust this claim because he failed to assert it on direct appeal or in his PCR appeal.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to analyze it on the merits pursuant to 28 U.S.C. § 2254(b)(2).  *See Taylor*, 504 F.3d at 427.

Due process requires that a defendant have competent representation both at trial and in a first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 392 (1985).  Appellate counsel, however, is not required to raise every non-frivolous issue on appeal but rather can and should make professional judgments regarding the issues most likely to prevail.  *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").

Thus, simply asserting that appellate counsel failed to raise a non-frivolous issue is insufficient to meet *Strickland*'s standard for ineffective assistance.  *Echols v. Ricci*, 492 F. App'x 301, 312 (3d Cir. 2012).  Accordingly, Petitioner's claim that his appellate counsel failed to raise

unspecified issues that he requested to be raised does not warrant habeas relief.  *See id.*

As to Petitioner's argument that appellate counsel should have asserted that all twelve jurors were tainted rather than just one, it appears that Petitioner is referring to his claim that the jury was exposed to extraneous information indicating that one of the victims was pregnant.  *See supra* Section III.A.  However, this argument is entirely meritless because his appellate counsel did argue that the jury was tainted by the information.  (*See* Direct Appeal Br. at 10–19). Accordingly, Petitioner's appellate counsel was not deficient, *see Strickland*, 466 U.S. at 687, and the Court denies Petitioner relief on Ground Nine.

### J.   Ineffective Assistance of Trial Counsel Claim for Failing to Call Petitioner's Alibi Witness (Ground Ten)

In Ground Ten, Petitioner argues that his trial counsel provided ineffective assistance by failing to interview and/or call alibi witness Juan Brito.  (*See* Am. Pet. at 22).

The Appellate Division considered this argument on PCR appeal.  It analyzed Petitioner's claim as follows:

> The PCR judge, who was not the trial judge, granted defendant an evidentiary hearing, *see Rule* 3:22-10, at which defendant and trial counsel testified.  Defendant said he was with a friend, Juan "Willie" Brito, at the time of the murder and into the early morning of the day after.  Defendant told this to trial counsel prior to trial.  Brito was present in the courtroom during most of the trial, but defendant believed his attorney never spoke to Brito.
>
> Defendant said his mother spoke to Brito, and Brito was willing to testify in support of defendant's alibi.  According to defendant, his attorney told him Brito's testimony was unnecessary because "we had the trial beat."  . . .
>
> After defendant's testimony [during the evidentiary hearing], PCR counsel advised that his next witness, Brito, who he had subpoenaed, was not present.  The prosecutor interjected:
>
> > Prosecutor: I'll be clear on the record what happened . . . Mr. Brito came to my office . . . after he received a copy

of [PCR counsel's] subpoena. He spoke to . . . my trial chief because I was in court on other obligations. And he basically explained . . . that what was in the affidavit supplied by [PCR counsel] was false. . . . [M]y chief had told Mr. Brito . . . come to [the judge's courtroom] as the subpoena directs, and then we'll . . . have everything cleaned up that day, just come in and tell the truth. We didn't say what happened. We just said come in today and tell the truth. I know [PCR counsel] did serve him. I know he sent someone from his office, or defense investigator . . . to follow up with him.

PCR counsel: That's correct.

Prosecutor: But I expected Mr. Brito to be here. The State does not intend to call him. . . . [A]t this point, Mr. Brito's not here, but the State did never subpoena him.

PCR counsel: I don't intend to call him . . . .

Trial counsel then testified. He met with defendant several times before trial and met Brito during trial. He recalled defendant was "adamant that perhaps Mr. Brito had some exculpatory evidence . . . along the lines of an alibi." Counsel recalled a "note" or "letter" authored by Brito, but, as trial approached and counsel investigated further, Brito was "reluctant to testify and ultimately did not want to testify." Counsel's "professional opinion" was that to the extent the "letter was attempting to establish an alibi[,] . . . the overwhelming facts of the case . . . flew in . . . the face of that." *See Graciano*, 2013 N.J. Super. Unpub. LEXIS 2040 at *3-4 (describing the "substantial" evidence of defendant's guilt, including the eyewitness testimony of several friends who were with him at the time of the shooting).

. . .

On cross-examination, counsel stated that defendant never denied

being at the scene of the shooting, but claimed he only fired a "warning" shot. Counsel said Brito ultimately chose not to testify "because he was going to perjure himself."

The PCR judge found trial counsel was credible and "did everything he could" with regard to Brito. . . . He entered an order denying defendant's PCR petition.

Before us, defendant argues trial counsel rendered ineffective assistance by failing to call Brito as an alibi witness . . . . We find no merit to these arguments and affirm.

Our "standard of review is necessarily deferential to a PCR court's factual findings . . . [and] we will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." *State v. Nash*, 212 N.J. 518, 540, 58 A.3d 705 (2013) (citing *State v. Harris*, 181 N.J. 391, 415, 859 A.2d 364 (2004)). However, we "need not defer to a PCR court's interpretation of the law; a legal conclusion is reviewed de novo." *Id.* at 540-41 (citing *Harris*, 181 N.J. at 415-16).

To establish an IAC claim, a defendant must satisfy the two-prong test formulated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and adopted by our Supreme Court in *State v. Fritz*, 105 N.J. 42, 58, 519 A.2d 336 (1987). A defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 52 (quoting *Strickland*, 466 U.S. at 687). Second, a defendant must prove he suffered prejudice due to counsel's deficient performance. *Strickland*, 466 U.S. at 687. A defendant must show by a "reasonable probability" that the deficient performance affected the outcome. *Fritz*, 105 N.J. at 58. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Pierre*, 223 N.J. 560, 583, 127 A.3d 1260 (2015) (quoting *Strickland*, 466 U.S. at 694; *Fritz*, 105 N.J. at 52).

Here, the PCR judge specifically found trial counsel was a credible witness who had thoroughly investigated Brito as an alibi witness for trial. Although the judge did not explicitly find Brito refused to commit perjury, trial counsel clearly reached that conclusion. Indeed, trial counsel testified that defendant never denied being in the van from which the fatal shot was fired. . . .

There simply is no credible evidence in the record to support the assertion that Brito, if forced to testify, would provide an alibi for

defendant. . . .

*Graciano*, 2018 WL 1415607, at *1–3.

Thereafter, the New Jersey Supreme Court summarily denied the claim on PCR appeal. *See Graciano*, 195 A.3d at 522.   Accordingly, the Court applies AEDPA's standards to the Appellate Division's determination on PCR appeal.   *See Simmons*, 590 F.3d at 231–32.

In his counseled brief in support of his petition, Petitioner argues that "there [was] no basis for the court to conclude that trial counsel did everything he could with regards to having him testify." (Reply at 57).  For example, Petitioner claims that trial counsel never even attempted to subpoena him.  (*See id.*).

However, even if Petitioner were able to establish that the Appellate Division and/or PCR court's finding that trial counsel did everything he could to have Brito testify was unreasonable, Petitioner's claim still fails under *de novo* review because Petitioner fails to demonstrate that counsel did not investigate Brito, that counsel's failure to call Brito was deficient, and that counsel's failure to call Brito prejudiced his defense.  First, Petitioner does not appear to challenge the PCR court's finding that trial counsel thoroughly investigated Brito, which is entitled to the presumption of correctness, even on *de novo* review.  *See Appel*, 250 F.3d at 210.  Moreover, that finding was reasonable because there was sufficient evidence in the record to support it.  For example, trial counsel testified that Brito came up during his pretrial investigation, (PCR Hr'g Tr. at 7:12–14), that he spoke to Petitioner about Brito on at least one occasion, (*see id.* at 8:14–20), and that he discussed Brito with Petitioner's family, (*see id.* at 21:16–20).  He also testified that he investigated a letter authored by Brito attempting to establish an alibi.  (*Id.* at 8:4–20).

Second, Petitioner fails to demonstrate that counsel's failure to call Brito was deficient. For example, counsel testified that there were credibility issues with the alibi because four or five

other people had corroborated Petitioner's presence in the van.  (*Id.* at 8:21–9:22).  Thus, it could have been sound trial strategy not to call Brito as a witness.  *See Strickland*, 466 U.S. at 689 (noting that counsel cannot be deemed ineffective when the challenged action "might be considered sound trial strategy").

Third, Petitioner fails to demonstrate that counsel's failure to call Brito prejudiced his defense.  As counsel correctly identified, four or five other people had corroborated Petitioner's presence in the van.  (PCR Hr'g Tr. at 8:21–9:22).  Moreover, as counsel also noted, those witnesses had little motivation to lie as they were not codefendants.  Accordingly, Petitioner fails to show by a reasonable probability that the outcome of the trial would have been different if counsel had called Brito.  Consequently, the Court denies Petitioner habeas relief on Ground Ten.

### K.    Ineffective Assistance of Trial Counsel Claim for Failure to Object to Certain Evidence (Ground Eleven)

In Ground Eleven, Petitioner argues that his trial counsel provided ineffective assistance by failing to object to the introduction of Elizabeth Lantigua's phone records.  (*See* Am. Pet. at 23).  Specifically, Petitioner contends: "[d]uring the cross-examination of Elizabeth Lantigua[,] the prosecutor asked Ms. Lantigua [about] a number of call[s] that she had allegedly made to [P]etitioner[.]  [U]pon Ms. Lantigua['s] denial[,] the prosecutor introduced some phone record[s] that stated that in the night in question Ms. Lantigua phoned [P]etitioner . . . 31 times[.]"  (*Id.*).  Petitioner contends that counsel's "fail[ure] to object to the introduction of these phone record[s] . . . allowed the prosecutor to lie to the jury because the phone records were/are from the evening after the incident and the jury was led to believe that they were from the night in question."  (*Id.*).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or in his PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim

*de novo* pursuant to 28 U.S.C. § 2254(b)(2).

Petitioner's claim is meritless.  The prosecutor never introduced Ms. Lantigua's phone records as evidence.  (*See* D.E. No. 22-1, January 20, 2011, Trial Tr. vol. I at 78:7 to 82:4).  Rather, Ms. Lantigua testified regarding several calls she made to Petitioner on the night of the shooting, and she testified that she could not remember making a number of calls to Petitioner the next day. (*See id.*).  To the extent that Petitioner's counsel could have objected to some of the questions regarding the phone calls on the basis that they did not specify whether the calls in question were in the early morning after the shooting or later that evening, Petitioner fails to demonstrate, and the Court cannot discern, how that prejudiced his defense.  *See Strickland*, 466 U.S. at 687. Accordingly, the Court denies Petitioner relief on Ground Eleven.

### L.   Ineffective Assistance of Trial Counsel Claim for Eliciting Prejudicial Testimony (Ground Twelve)

In Ground Twelve, Petitioner argues that his counsel was ineffective because he elicited testimony that Petitioner contends was extremely prejudicial.  (*See* Am. Pet. at 24).  According to Petitioner, in response to trial counsel's line of questions regarding how witness Angie Rodriguez knew that Petitioner was the shooter, Rodriguez responded, "[s]o, before I [sic] in school, Julio's name used to ring bells practically because of the things he used to do in school."  (*See id.*). Petitioner contends this implied that Petitioner had been involved in street violence and argues that counsel was ineffective for eliciting this testimony.  (*See id.*).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or on PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

As noted above, to make out an ineffective assistance of counsel claim, petitioner must

show that counsel's performance was deficient and prejudiced his defense. *See Strickland*, 466 U.S. at 687.  In this case, Petitioner fails to demonstrate how counsel's line of questioning was deficient.   In her testimony, Rodriguez concluded that Petitioner was the shooter based on Petitioner's movements right after she heard the shooting.  (January 24, 2011, Trial Tr. vol. I at 169:15–170:19).   On cross-examination, trial counsel elicited testimony from Rodriguez suggesting that she had her eyes closed at the time of the shooting and that she was not really listening because she was zoned out.  (*See* January 24, 2011, Trial Tr. vol. II at 208:2–209:3).  The following dialogue between trial counsel and Rodriguez immediately followed:

> Q.  How did you arrive at the conclusion that Julio was the shooter?
> A.  The police said they had evidence.
>
> . . .
>
> Q.  Did [the police] inform you Julio was the shooter?
> A.  No, they did not.
> Q.  Did you arrive at that conclusion by yourself?
> A.  Yes.
> Q.  How?
> A.  They said somewhere -- well, they asked me who had a gun in between all six of us.
> Q.  And what was your answer?
> A.  Correct, I said, no, that I know nobody had a gun.  Correct, I do watch TV, and they kind of asked me, do you know this person, sign and date it, or how you know him?  So I know they basically emphasize more on one person.  And that's how I make my conclusion.
> Q.  So, you arrived at the conclusion that Julio was the shooter because you watch TV?
> A.  They emphasize on him practically.  They asked me who was everybody.  Sign and date the picture.  And they asked me for how long I knew Julio and this and have I chilled with him before, things like that.  So, I knew that was coming from basically around there. . . . But Julio, I didn't really know him.  Yokasta was my friend, so I used to be with her, and I know she practically wouldn't do anything like that.  Carlos is my man, so I know he didn't do anything like that.   So, before I in school, Julio's name used to ring bells

practically because of the things he used to do in school.

(*Id.* at 209:4–211:9).  At that point, trial counsel objected to the testimony, but the Court responded that counsel had "kind of opened the door on this whole thing" because he had asked the question. (*Id.* at 211:10–212:8).

The Court finds that trial counsel's line of questioning was more than reasonable.  It called into question the basis of the witness's identification of Petitioner as the shooter as well as her credibility.  Moreover, counsel could not have reasonably anticipated the witness's response.  As Petitioner fails to demonstrate this his counsel's performance was deficient, *see Strickland*, 466 U.S. at 687, the Court denies Ground Twelve.

### M.  Ineffective Assistance of Trial Counsel Claim for Failing to Request to Remove Juror 14 (Ground Thirteen)

In Ground Thirteen, Petitioner argues that his trial counsel provided ineffective assistance by failing to request the removal of Juror 14 when he discovered that she had been exposed to extraneous information.  (*See* Am. Pet. at 25).  Petitioner contends that counsel should have requested that she be replaced as an alternative to the motion for a mistrial that counsel had filed. (*See id.*).[7]

Petitioner failed to exhaust this claim before the state courts because he did not raise it  on direct appeal or on PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

As noted above, to make out an ineffective assistance of counsel claim, petitioner must show that counsel's performance was deficient and prejudiced his defense.  *See Strickland*, 466 U.S. at 687.  Here, Petitioner fails to demonstrate that his counsel's performance was deficient or

---

[7]     *See supra* Section III.A for a recitation of the facts relevant to this claim.

that counsel's performance prejudiced the defense.  For example, as Petitioner himself argues in his counseled brief in support of his petition, trial counsel "could not possibly have asked for Juror 14 to be removed when she was visibly pregnant" because "[t]o do so would cause the rest of the jury to believe that Juror 14 was removed simply because she was pregnant."  (*See* Reply at 36).  Thus, as Petitioner himself contends, it would have been a sound trial strategy not to ask for Juror 14 to be replaced.  *See Strickland*, 466 U.S. at 689 (noting that counsel cannot be deemed ineffective when the challenged action "might be considered sound trial strategy").

Regardless, Petitioner fails to show that it is more likely than not that a request to replace Juror 14 with an alternate would have been more successful than counsel's motion for a mistrial. *See Nix*, 475 U.S. at 175.  The trial court specifically found that a curative instruction was the appropriate remedy, (*see* February 23, 2011, Trial Tr. at 51:12–53:19), and Petitioner fails to provide any reason why the trial judge would have found otherwise if counsel had asked for an alternate to replace Juror No. 14 in addition to or instead of moving for a mistrial.  Accordingly, the Court denies habeas relief on Ground Thirteen.

### N.    Ineffective Assistance of Trial Counsel Claim for Failing to Move to Suppress Testimony of Certain Witnesses (Ground Fourteen)

In Ground Fourteen, Petitioner argues that he was denied effective assistance of counsel by counsel's failure to file a motion to suppress the allegedly tainted testimonies of several state witnesses.  (*See* Am. Pet. at 26).  Specifically, Petitioner contends that witness Angie Rodriguez's testimony was tainted because "the police emphasized [Petitioner] so she knew to pick [him]." (*Id.*).  Petitioner also contends that several other witness's testimonies were tainted because Detective Heath and other detectives allegedly scared them with threats of going to prison.  (*Id.*).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or in his PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se*

Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

An in-court identification of a defendant tainted by an "identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification" is suppressible on due process grounds.  *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006).  For example, "showing a witness a photographic array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select."  *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003).  Regarding the second prong of the test, concerning the overall reliability of the identification, courts consider several non-exclusive factors, including "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

Here, Petitioner fails to demonstrate by a reasonable probability that a motion to suppress would have succeeded and altered the outcome of the trial.  *See Strickland*, 466 U.S. at 687; *Nix*, 475 U.S. at 175.  For example, Petitioner fails to demonstrate that the identification procedure used by police created a substantial risk of misidentification.  *See Brownlee*, 454 F.3d at 137.  Here, there was little risk of misidentification because Rodriguez knew Petitioner previously.  *See, e.g.*, *Graves v. Wenerowicz*, No. 10-1563, 2013 U.S. Dist. LEXIS 187962 (D.N.J. Feb. 28, 2013) (noting that the facts that the witness knew petitioner and recognized his distinctive voice were indicative of a high-degree of reliability of the identification).  Petitioner also fails to provide any evidence that police intimidated witnesses into making inculpatory statements with threats of

going to prison.  Accordingly, Petitioner fails to demonstrate that his counsel's failure to file a motion to suppress certain witnesses' testimony prejudiced his defense, and the Court denies Petitioner relief on Ground Fourteen.

**O.      Ineffective Assistance of Trial Counsel Claim for Failure to Object to Prosecutor's Misconduct (Ground Fifteen)**

In Ground Fifteen, Petitioner claims that his trial counsel was ineffective for failing to object to the prosecutor's alleged misconduct during summation.  (*See* Am. Pet. at 27).  According to Petitioner, his trial counsel "failed to object to the prosecutor's remarks during summation when she told the jury to worry about the victim[']s rights[] and not petitioner's rights because it was the victim's trial."  (*Id.*).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or in his PCR petition.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

As an initial matter, the prosecutor did not tell the jury not to consider petitioner's rights or that it was the victim's trial.  (*See* February 8, 2011, Trial Tr. vol. II at 82:21–83:6).  Rather, the prosecutor told the jury the following.

> We all greatly appreciate the effort that you're making to do this job for us and I'm sure . . . Mr. Graciano does as well.  And I also want you to know that Elisha Wordelman and Jamar and John Boyd and Evy and Byron Stevenson they appreciate that you're doing this as well, because although we start always and we say, well, you know, the defendant is entitled to a fair trial?  You know who else is entitled to a fair trial?  Elisha, Jamar, John, Evy.  They're entitled to fair [sic] too.

(*Id.*).

Moreover, even assuming the prosecutor's statements were objectionable, Petitioner fails to demonstrate that counsel's failure to object prejudiced his defense.  *See Strickland*, 466 U.S. at

687.  For example, Petitioner fails to demonstrate by a reasonable probability that counsel's objection would have had any effect on the outcome of the case.  Accordingly, the Court denies relief on Ground Fifteen.

> **P.    Ineffective Assistance of Trial Counsel Claim for Failing to Request an Adverse Inference Jury Charge Regarding Allegedly Destroyed Statements (Ground Sixteen)**

In Ground Sixteen, Petitioner argues that his trial counsel was ineffective for failing to request an adverse inference jury charge because the police allegedly "destroy[ed]" exculpatory witness statements.  (*See* Am. Pet. at 28).  According to Petitioner, "Detective Heat[h] stated [o]n record that they did not record[] or type the exculpatory statements made by witnesses because these did not match the inculpat[ory] ones that they already had."  (*Id.*).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or in his PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

Petitioner's claim is completely meritless.  Petitioner fails to demonstrate or provide any evidence that the police destroyed any witness statements.  Nothing in the record demonstrates otherwise.  Accordingly, the Court denies Ground Sixteen.

> **Q.    Due Process Claim that Trial Judge Undermined Defense Counsel's Competence in Court (Ground Seventeen)**

In Ground Seventeen, Petitioner argues that the trial judge denied his right to a fair trial by questioning and undermining his counsel's competence in open court.  (*See* Am. Pet. at 29).  According to Petitioner;

> After a jury question[,] counsel asked the court if he could have a copy of the question[.]   [T]his angered the judge[,] and he told counsel that he could take the question to his partner or whomever he want[s.]  [C]ounsel['s] response was "I don't appreciate the court

calling me ineffective in open court[.]"  [A]fter this, counsel and [the] judge kept arguing for several days in regard to the judge[' s] remarks[] to the point that counsel told the judge that if that had happened years ago he would've . . . lock[ed] him up.

(*Id.*).

Although it is not entirely clear, the Court construes the claim as involving the following colloquy.  As previously discussed, on March 4, 2011, before the jury returned a verdict, the jury sent out a note asking the court whether the jury needed to come to a unanimous decision on all counts.  (March 4, 2011, Trial Tr. at 11:16–22).  The following discussion between Petitioner's trial counsel and the court took place outside the presence of the jury:

> MR. SOMOHANO:  Judge, respectfully, may I request a copy of that note?
> THE COURT:  Sure.
> MR. SOMOHANO:  Thank you, Judge.
> THE COURT:  You can get a copy.
> MR. SOMOHANO:  My client is asking for one.
> THE COURT:  You can call whoever you want.  Do you follow me? Report back to me.  I don't care.
> MR. SOMOHANO:  Judge, I'm not --
> THE COURT:  Make a copy for him.  If he wants to go see if somebody else can help him, two heads are better than one and I don't blame you on that.
> MR. SOMOHANO:  Judge, I -- I don't appreciate the Court's comments about that, Judge.  That's not the purpose.  The reason why I'm asking for it is because my client asked me for it.  And quite honestly, I don't appreciate the editorial comment afterwards, Judge, respectfully.  I can do what I want to do.  I can present the best defense that I can for my client.  If I have questions or doubts, I can do that.  By placing those comments on the Court, Judge, I don't know what to do in this case and that's just not right, Judge, so --
> THE COURT:  That's not -- that's not what my intent was.  If have [sic] two heads are better than one, you know, sometimes judges will talk to each other.  I would have no objection if you did it and I was going to give you the time to do it.  You understand?
> MR. SOMOHANO:  And you could have done all of that without placing those comments on the record, Judge, that's all I'm saying. That's all I'm saying.
> THE COURT: Okay.

(*Id.* at 26:24–28:8).  The jury returned a verdict later that day before the trial judge had issued a formal ruling on the question posed by the jury.  (*See id.* at 33:21–25).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or in his PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

Even assuming Petitioner's allegations are true and that the trial court's actions amounted to error, the Court finds the trial court's actions harmless.  To be entitled to habeas relief, a habeas petitioner must establish that a trial error "had [a] substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Under this test, a court may grant relief only if it has a "grave doubt" as to whether the error at trial had a substantial and injurious effect or influence.  *Davis v. Ayala*, 576 U.S. 257, 267–68 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).  In other words, "[t]here must be more than a 'reasonable probability' that the error was harmful."  *Id.* (quoting *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710).

Petitioner fails to demonstrate that the exchange had any effect in determining or influencing the jury's verdict.  *See Brecht*, 507 U.S. at 637.  The conversation occurred outside the presence of the jury while it was deliberating, and the jury came back with a verdict later that day.  (*See* March 4, 2011, Trial Tr. at 33:21–25).  Accordingly, the Court denies Petitioner relief on Ground Seventeen.

### R.     Ineffective Assistance of Trial Counsel Claim for Failing to Obtain Ballistics Expert (Ground Eighteen)

In Ground Eighteen, Petitioner argues that his trial counsel was constitutionally ineffective for failing to obtain a ballistics expert.  (*See* Am. Pet. at 30).  According to Petitioner, during pre-trial conferences, his counsel asked the court for time to find a ballistics expert.  (*See id.*).

Petitioner alleges that an expert would have testified as to whether two kinds of bullets can be shot from the same gun, and as to the trajectory of the bullet that struck the victim.  (*See id.*).  Petitioner provides no further details regarding his claim.  (*See id.*).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or in his PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se* Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

"[A petitioner's] failure to include a sworn statement regarding the nature of [a witness's] proposed testimony is fatal to his making a *prima facie* showing of prejudice. *Tolentino v. United States*, No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014); *see also Duncan v. Morton*, 256 F.3d 189, 201–02 (3d Cir. 2001).  Here, Petitioner fails to provide the name of any willing ballistics expert or a sworn statement containing any proposed expert testimony.  Accordingly, the Court denies Petitioner relief on Ground Eighteen.

### S.    Due Process Claim Regarding Prolonged Trial (Ground Nineteen)

In Ground Nineteen, Petitioner argues that he "was denied his constitutional right to a fair trial when the trial court unnecessarily broke and prolonged the trial for no valid reason."  (*See* Am. Pet. at 31).  The only additional details Petitioner provides in support of this claim are that: (i) the trial "was schedule[d] to last two weeks [but] lasted two months[] because the prosecutor's witness [was] nowhere to be found," and (ii) "the trial judge[,] in an attempt to aid the prosecutor[,] postponed the trial days[,] sometimes breaking the trial for weeks[,] which ended up tiring the jury and aggravating them to the point that they just wanted to reach a verdict to get out of there."  (*See id.*).

Petitioner failed to exhaust this claim before the state courts because he did not raise it on direct appeal or in his PCR appeal before the Appellate Division.  (*See* Direct Appeal Br.; *Pro Se*

Suppl. Direct Appeal Br.; PCR Appeal Br.).  Nonetheless, the Court proceeds to review the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

Petitioner fails to demonstrate or present any evidence that any prolonged break occurred during the trial, that a two-month break occurred because the prosecutor's witness could not be found, or that the trial judge attempted to aid the prosecutor by postponing the trial.  In fact, the record demonstrates that no significant break occurred.[8]  Accordingly, the Court denies Petitioner relief on Ground Nineteen.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  For the reasons expressed above, Petitioner's claims are all without merit and jurists of reason

---

[8]      The trial began on Wednesday, January 19, 2011.  (D.E. No. 21-1, January 19, 2011, Trial Tr.).  On Friday, January 21, 2011, the Court sent the jury home a few hours early because it snowed heavily and because the prosecutor let a witness leave as she did not expect there to be time for the witness to testify on that day.  (January 21, 2011, Trial Tr. at 156:12–159:6).  On Wednesday, January 26, 2011, the Court let the jury go home early because of a snowstorm.  (D.E. No. 23-3, January 26, 2011, Trial Tr. at 67:1–22, 164:4–165:18).  The Court was closed on Thursday, January 25, because of the snowstorm.  (*See* January 31, 2011, Trial Tr. at 11:17–25).

The State and defense rested their case on Monday, February 7, 2011, (February 7, 2011, Trial Tr. at 98:3–6), and the parties gave closing arguments on Tuesday, February 8, 2011.  (*See* D.E. No. 24-3, February 8, 2011, Trial Tr. vol. I).  The judge gave the jury the option of coming in on Wednesday and Thursday or waiting until Monday to be charged.  (February 8, 2011, Trial Tr. vol. II at 105:1–24).  The jury elected to come in on Monday.  (*Id.*).

On Monday, February 14, 2011, the trial judge charged the jury, and they began deliberating.  (*See* D.E. No. 26-1, February 14, 2011, Trial Tr.).  The jury continued deliberating until it returned a verdict on March 4, 2011.  (*See* D.E. No. 28-1, March 4, 2011, Trial Tr.).

would not disagree with this Court's denial of Petitioner's habeas petition.  Accordingly, Petitioner is denied a certificate of appealability.

## V.      CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.  An appropriate order follows.


Dated:  May 21, 2024                                    s/ Esther Salas
                                                              **Esther Salas, U.S.D.J.**